# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>TRIBUNE COMPANY, *et al.*,<br><br>       Debtors. | Chapter 11<br>Bankr. Case No. 08-13141 (KJC)<br>Jointly Administered |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK, DEUTSCHE BANK TRUST COMPANY AMERICAS,<br><br>       Appellants,<br><br>-against-<br><br>TRIBUNE COMPANY, *et al*,<br><br>       Appellees. | Bankruptcy Appeal<br><br>Dist. Ct. Case No. 12-1073 (GMS) |

## REPLY BRIEF OF THE APPELLANTS,
## LAW DEBENTURE TRUST COMPANY OF NEW YORK
## AND DEUTSCHE BANK TRUST COMPANY AMERICAS

KATHARINE L. MAYER
MCCARTER & ENGLISH, LLP
Renaissance Center
405 N. King Street
Wilmington, Delaware 19801
(302) 984-6300

DAVID J. ADLER
MCCARTER & ENGLISH, LLP
245 Park Avenue
New York, New York 10167
(212) 609-6800

*Attorneys for Appellant Deutsche Bank
Trust Company Americas*

GARVAN F. MCDANIEL
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
(302) 429-1900

DAVID S. ROSNER
SHERON KORPUS
CHRISTINE A. MONTENEGRO
MATTHEW B. STEIN
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Appellant Law Debenture
Trust Company of New York*

October 11, 2012

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

I.   The Bankruptcy Court Erred In Finding That The Plan Did Not Unfairly
     Discriminate Against The Senior Noteholders. ........................................................ 2

     A.   The Appeal Is Subject To *De Novo* Review. ........................................................ 2

     B.   Appellees' Expansive Reading Of "Notwithstanding
          Section 510(a)" Is Unsupportable. ............................................................... 3

     C.   The Bankruptcy Court Misapplied The *Armstrong* Test To
          Determine Whether The Plan's Discrimination Is Material. .................................. 7

II.  The Bankruptcy Court Erred In Finding The Swap Claim Is Entitled To Senior Treatment
     Under The PHONES Indenture And EGI Subordination Agreement. ............................ 9

     A.   DCL Plan Proponents Have Not Met Their Burden. ........................................... 9

     B.   The Court Must Reject Appellees' New Contentions And
          Extrinsic Evidence. ........................................................................... 10

     C.   The Swap Claim Is Not "Indebtedness" Under The PHONES
          Indenture. .................................................................................... 10

     D.   The Swap Claim Does Not Qualify As "Senior Indebtedness"
          Under The PHONES Indenture. ................................................................. 12

     E.   The Swap Claim Does Not Constitute A Senior Obligation Under
          The EGI Subordination Agreement. ........................................................... 15

CONCLUSION................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ben-Tom Supply Co. v. V. N. Green & Co.*,
338 F. Supp. 59 (S.D. W. Va. 1971)................................................................10

*BKB Props., LLC v. Suntrust Bank*,
453 Fed. Appx. 582 (6th Cir. 2011)................................................................14

*Bruesewitz v. Wyeth Inc.*,
561 F.3d 233 (3d Cir. 2009)..........................................................................4

*Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene*,
413 Md. 201 (Md. 2010)..........................................................................12, 13

*Falco v. Alpha Affiliates, Inc.*,
2000 WL 727116 (D. Del. Feb. 9, 2000) ...........................................................10

*FDIC v. First Heights Bank, FSB*,
229 F.3d 528 (6th Cir. 2000) ......................................................................15

*First Nat'l Bank Ass'n v. Canadian Imperial Bank of Commerce*,
1995 U.S. Dist. LEXIS 12105 (D. Minn. June 9, 1995).........................................13

*Greystone Cmty. Reinvestment Ass'n v. Berean Capital, Inc.*,
638 F. Supp. 2d 278 (D. Conn. 2009)...............................................................15

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)................................................................. *passim*

*In re BearingPoint, Inc.*,
2009 Bankr. LEXIS 5045 (Bankr. S.D.N.Y. Dec. 22, 2009)....................................6

*In re Consul Rest. Corp.*,
146 B.R. 979 (Bankr. D. Minn. 1992) ...............................................................6

*In re Enron Creditors Recovery Corp.*,
370 B.R. 64 (Bankr. S.D.N.Y. 2007).............................................................9, 11

*In re Federal-Mogul Global Inc.*,
684 F.3d 355 (3d Cir. 2012)..........................................................................5, 6

*In re Leasing Consultants, Inc.*,
2 B.R. 165 (Bankr. E.D.N.Y. 1980)................................................................11

*In re Payless Cashways*,
215 B.R. 409 (Bankr. W.D. Mo. 1997)..............................................................11

*Jameson Realty Grp. v. Kostner,*
  813 N.E.2d 1124 (Ill. App. Ct. 2004) ...................................................................11

*Jarecki v. Shung Moo Louie,*
  722 N.Y.S.2d 784 (2001) ..................................................................................13

*JPMorgan Chase & Co. v. Comm'r,*
  458 F.3d 564 (7th Cir. 2006) .............................................................................12

*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs., LLC,*
  30 A.D.3d 1 (N.Y. App. Div. 2006) ..................................................................15

*Pellaton v. Bank of New York,*
  592 A.2d 473 (Del. 1991) ..................................................................................10

*Procter & Gamble Co. v. Bankers Trust Co.,*
  925 F. Supp. 1270 (S.D. Ohio 1996) .............................................................11, 12

*Student Pub. Interest Research Group v. AT & T Bell Labs.,*
  842 F.2d 1436 (3d Cir. 1988)..............................................................................3

*Suburban Auto Rebuilders, Inc. v. Assoc. Tile Dealers Warehouse, Inc.,*
  902 N.E.2d 1178 (Ill. App. Ct. 2009) ...........................................................14-15

*Taylor v. Mooney Aircraft Corp.,*
  265 Fed. Appx. 87 (3d Cir. 2008)......................................................................10

*Thrifty Oil v. Bank of Am. Nat'l Trust & Sav. Ass'n,*
  322 F.3d 1039 (9th Cir. 2002) ...........................................................................11

*United States v. Allegheny Ludlum Corp.,*
  366 F.3d 164 (3d Cir. 2004)................................................................................3

*Wis. Public Intervenor v. Mortier,*
  501 U.S. 597 (1991)............................................................................................4

**STATUTES**

11 U.S.C. § 510(a) ...............................................................................................3, 4, 5

11 U.S.C. § 1129............................................................................................... *passim*

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009)....................................................................11

Christopher Dean Olander & Cynthia L. Spell, *Interest Rate Swaps: Status Under
  Federal Tax & Securities Laws,* 45 Md. L. Rev. 21 (1986) ..........................12, 14

Investopedia,
   http://www.investopedia.com/terms/a/accruedexpense.asp.....................................................15

Note, *Tax Treatment of Notional Principal Contracts*, 103 Harv. L. Rev. 1951 (1990)...............14

5 Bankr. Serv. Law. Ed. § 45:353 (Apr. 2012)................................................................................6

By and through their undersigned counsel, Law Debenture Trust Company of New York

("Law Debenture") and Deutsche Bank Trust Company Americas ("DBTCA" and together with

Law Debenture, "Appellants") file this reply in further support of their Opening Brief ("Trustee

Br.") and in opposition to the DCL Plan Proponents' Consolidated Answering Brief On Appeals

of Bankruptcy Orders of DCL Plan Proponents ("Appellees' Brief" or "Apl. Br.").[1]

## PRELIMINARY STATEMENT

The Bankruptcy Court committed a fundamental legal error by incorrectly applying the

unfair discrimination standard in cramming down the Plan over the dissent of the Senior

Noteholders.  For the Plan not to violate Bankruptcy Code Section 1129(b)'s unfair

discrimination requirement, the Senior Noteholders must receive distributions equivalent to that

of similar claims and also fully enforce their rights under the Subordination Agreements.  The

unfair discrimination test, though not mechanical, is straightforward.  Applying *In re Armstrong

World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006), claims of equal parity against the Debtor

(*i.e.* the Senior Noteholders and the Other Parent Claims) should receive equal or at least not

materially lesser treatment *prior* to taking into account the Senior Noteholders' contractual

benefit of "turned over" recoveries from third-party subordinated creditors.  Adopting Appellees'

terminology, the Plan must not discriminate unfairly against the Senior Noteholders "without

obstruction by" or "despite" application of the Subordination Agreements.  In other words,

"despite" the Subordination Agreements, the Plan should not provide materially different

recoveries to equal classes.  Here, if the Court properly applies the *Armstrong* unfair

discrimination test, which requires the analysis of the distributions from the estate "without

obstruction by" the Subordination Agreements, then it must conclude that the Plan

---

[1]  Capitalized but undefined terms have the meanings set forth in the Opening Brief [D.I.  4].
The DCL Plan Proponents' Appendix is referred herein as "DCL-A___".

unquestionably provides the Senior Noteholders with a materially diminished recovery compared with the Other Parent Claims.

The Bankruptcy Court also committed reversible error by finding the Swap Claim is senior debt with turn over rights under the Subordination Agreements in contravention of their plain, unambiguous language.  Unable to meet their burden to show the Swap Claim benefits from the Subordination Agreements, Appellees rely on extrinsic evidence – despite the unambiguous language of the Subordination Agreements – and contradict their prior judicial admissions.  The Swap Claim does not qualify as "Senior Indebtedness" under the PHONES Indenture because, as relevant case law and common sense demonstrate, an interest rate swap is not "debt" because the counterparties to the swap exchange no principal.  Further, the Swap Claim is not "Senior Indebtedness" because the obligations arising under the Swap Agreements are not amounts due "in connection with" the Credit Agreement.  Payments Tribune made to Barclays Bank PLC ("Barclays") under the Swap Agreements in no way satisfied its obligations to make principal and interest payments to the Senior Lenders (as defined in the Plan) under the Credit Agreement.  Similarly, the Swap Claim is not a "Senior Obligation" under the EGI Subordination Agreement because payments due under the Swap Claim are accrued expenses that Tribune incurred in the ordinary course of business as a hedge against interest rate exposure.  Thus, the Swap Claim is not entitled to receive any benefits under the Subordination Agreements.

I.    **The Bankruptcy Court Erred In Finding That The Plan Did Not Unfairly Discriminate Against The Senior Noteholders.**

A.    **The Appeal Is Subject To *De Novo* Review.**

Appellees assert that the Allocation Disputes Memorandum is subject to clear error, rather than *de novo*, review, focusing on the Bankruptcy Court's decision that the Senior Noteholders' diminished recovery is only a reduction from 35.9% to 33.6% and therefore is not

material. (Apl. Br. at 60-63). Appellees miss the point. Appellants are not arguing that the court's determination that a 2.3% diminution in recovery is immaterial (which is a factual issue). [A290-91] Rather, Appellants contest the Bankruptcy Court's failure at the outset to use the correct inputs in applying the *Armstrong* test (which is a legal issue). (Trustee Br. at 25-27). (*See, infra* Sec. I.C.). The appeal from the misapplication of the legal standard, like here, as opposed to an appeal from the weighing of facts, is subject to a *de novo* standard of review as made clear by the Third Circuit Court of Appeals in *Student Pub. Interest Research Group v. AT & T Bell Labs.*, 842 F.2d 1436, 1442 & n.3 (3d Cir. 1988). There, in analyzing the standard of review for the calculation of attorneys' fees, the Third Circuit explained that while the determination of market billing rates is factual, whether the district court used the proper *standard* for its calculation must be reviewed *de novo. Id.*; *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164 (3d Cir. 2004). This rationale applies equally here. (Trustee Br. at 2-3).

**B.    Appellees' Expansive Reading Of "Notwithstanding Section 510(a)" Is Unsupportable.**

Contrary to Appellees' assertion, Appellants do not seek to "excise the phrase 'notwithstanding section 510(a)'" from Bankruptcy Code Section 1129(b)(1). (Apl. Br. at 63). Rather, Appellants submit that this phrase instructs the Court how to apply the unfair discrimination and absolute priority tests, which are the two critical protections Congress provided when, as here, the Debtor seeks to cram down the Plan over a dissenting class and the dissenting class members enjoy the benefits of third-party subordination rights. Appellants explained in their Opening Brief that "notwithstanding section 510(a)" requires the Court to "evaluate these two 'equality' tests without (or notwithstanding)" the separate benefit a creditor

3

receives from third-party contractual subordination.[2]  (Trustee Br. at 12).  Appellees offer no

legally significant response to this argument.  Congress expressly endorsed Appellants'

interpretation of Section 1129(b)(1) in the directly on-point *and only* example that Congress put

in the legislative history that describes the proper application of the unfair discrimination test in

the context of subordination agreements.  Appellees again offer no legally significant response to

this text but merely claim that the legislative history example is "useless" and outdated.  As

legislative history is always contemporaneous with the statute itself, it is explanatory and not

outdated.[3]  (Apl. Br. at 72).  Appellees do not, and cannot, cite any case law developments that

override Congress's contemporaneously explanatory example.  Nor can they cite to any case law

or policy considerations to support their argument that Congress intended, in the two critical

*protections* given to dissenting creditors in a cram down, not to protect the dissenting class, but

actually to strip it of its third-party subordination rights.

 Instead, Appellees argue that the word "notwithstanding" preempts the enforcement of

subordination agreements though Bankruptcy Code Section 510(a) requires their enforcement

and Bankruptcy Code Section 1129(a)(1)'s confirmation standard requires that the Plan

---

[2]  Enforcing the Subordination Agreements does not provide Senior Noteholders with "enhanced protections merely by virtue of intercreditor arrangements they may have negotiated before the bankruptcy case," as Appellees argue.  (Apl. Br. at 65).  Nor is it relevant that the holders of Other Parent Claims are not in privity of contract with the Senior Noteholders.  (Apl. Br. at 65).  The dispute here concerns whether the Plan discriminates unfairly against the Senior Noteholders by depriving them of their *contractual* third-party subordination rights.  (Trustee Br. at 10-27).

[3]  Contrary to Appellees' assertion, courts do not rely upon legislative history only when the statute is ambiguous.  (Apl. Br. at 70-71).  Courts also rely on legislative history to decide between two plausible interpretations of a statute.  *See Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 245 (3d Cir. 2009), *aff'd sub nom. Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068 (2011).  Additionally, the Supreme Court has noted that "common sense suggests that inquiry benefits from reviewing additional information rather than ignoring it" and that "[l]egislative history materials are not generally so misleading that jurists should never employ them in a good-faith effort to discern legislative intent." *Wis. Public Intervenor v. Mortier*, 501 U.S. 597, 610 n.4 (1991) (concurring).  Regardless, here, as set forth in the Opening Brief, the use of "notwithstanding" is ambiguous.  (Trustee Br. at 13-17).

'compl[y] with the applicable provisions of [the Bankruptcy Code]." (Apl. Br. at 66-67). However, neither the plain text of the statute nor relevant case law supports Appellees' argument. (Apl. Br. at 67). Bankruptcy Code Section 1129(b)(1) excuses only one confirmation requirement when permitting cram down of a plan. That is, naturally, the requirement in Bankruptcy Code Section 1129(a)(8) that all impaired creditor classes have accepted the plan. Cram down does not excuse the plan from complying with all other Bankruptcy Code provisions, including Bankruptcy Code Section 510(a), which requires enforcement of subordination agreements. (Trustee Br. at 10-11).

Moreover, the "notwithstanding" cases Appellees cite do not bolster their argument. (Apl. Br. at 65-66). These cases only interpret the term "notwithstanding" in other contexts. None indicates its meaning when a debtor crams down a plan on a class of senior creditors with third-party subordination rights. In *In re Federal-Mogul Global Inc.*, 684 F.3d 355 (3d Cir. 2012), the Court reviewed a separate section of the Bankruptcy Code and held that, although the term "notwithstanding" effected preemption, courts must look further to "identify the domain expressly pre-empted," and that "[e]ven in instances of express preemption, the presumption in favor of state law applies, requiring us to accept 'a plausible alternative reading . . . that disfavors pre-emption." *Id.* at 369. Appellees provide no basis for the broad interpretation they advocate to weaken the Senior Noteholders' statutory protection. The more plausible, if not obvious, reading of Bankruptcy Code Section 1129(b)(1) is that subordination rights are preempted only in the application of the unfair discrimination and fair and equitable tests; meaning, the Plan cannot utilize third-party contractual benefits "to equalize" recoveries. Rather, the Plan must not discriminate unfairly *prior* to the enforcement of the subordination rights. For this reason, the legislative history explains that senior creditors with subordination rights (here the Senior

Noteholders) must receive the same recovery from the estate as all other similarly situated

creditors and then receive an additional payment from the turnover of the subordinated creditors'

(here the PHONES and EGI) recovery. Those creditors without either subordination rights or the

obligation to turn over their recovery (here the Other Parent Claims), only receive a recovery

from the estate. Yet here, the Plan provides for these creditors to share in the third-party

contractual benefits of the Subordination Agreements.

     *Federal-Mogul* further counsels against reading terms expansively if that reading leads to

an "absurd result." As discussed above, interpreting Bankruptcy Code Section 1129(b)'s

"notwithstanding" clause as broadly eliminating subordination agreements in cram down *does*

lead to an absurd result. It excises subordination agreements from *both* the "unfair

discrimination" and "fair and equitable" protections. That would permit debtors to ignore

contractual seniority even as between the junior and senior classes, which contravenes the very

definition of "fair and equitable." Yet, courts have repeatedly upheld contractual subordination

in connection with the fair and equitable test. *In re BearingPoint, Inc.*, 2009 Bankr. LEXIS

5045, at *24-26 (Bankr. S.D.N.Y. Dec. 22, 2009); *In re Consul Rest. Corp.*, 146 B.R. 979, 988

(Bankr. D. Minn. 1992); 5 Bankr. Serv. Law. Ed. § 45:353 (Apr. 2012) ("Subordination rights of

classes are enforceable in cramdown under fair and equitable concepts of 11 U.S.C.A.

§ 1129(b)") (*citing Consul*, 146 B.R. at 988). To avoid this obvious error, Appellees argue that

subordination agreements are enforceable as to "fair and equitable" protections but not

enforceable as to "unfair discrimination" protections, contrary to *Federal-Mogul*'s guidance.[4]

     Additionally, while Appellees assert that the use of the word "notwithstanding" in

---

[4] *Id.* at 369 ("It is hardly natural to read the 'notwithstanding' clause in § 1123(a) as applying
only to some, but not all, of subsection (a), an approach that contravenes any normal method of
statutory interpretation.").

Bankruptcy Code Section 1129(b)(1) preempts the enforcement of subordination agreements in cram down plans, they admit that this Section does not *entirely* eliminate their enforceability. (Apl. Br. at 64, 68, 70). They argue that the preemption of subordination agreements is "flexible" in that it depends on whether the preemption produces a materially lower recovery to the beneficiaries of subordination. (*Id.* at 64). This "flexible" approach finds no support in the statute or in the legislative history. In fact, the opposite is true.

Thus, the Bankruptcy Court committed reversible error because its reading of Bankruptcy Code Section 1129(b)(1), as well as the Appellees reading, is not supported by the plain language of the statute, legislative history or interpretation principles.

**C.     The Bankruptcy Court Misapplied The *Armstrong* Test To Determine Whether The Plan's Discrimination Is Material.**

The Bankruptcy Court erred in misapplying *Armstrong* to determine whether the Plan's failure to enforce the Subordination Agreements fully results in material discrimination against the Senior Noteholders. *Armstrong*'s unfair discrimination test assesses whether "a difference in the plan's treatment of two classes" results in "a materially lower percentage recovery for the dissenting class." 348 B.R. at 121. Properly applying *Armstrong*, the Bankruptcy Court had to compare the Senior Noteholders' and the Other Parent Creditors recoveries without resort to the Senior Noteholders' third-party contractual subordination rights. (Trustee Br. at 23-25). In other words, the comparison is of the recoveries from the estate, not those obtained from other sources. (*Id.*). The Bankruptcy Court, however, compared what it viewed as the difference in the Senior Noteholders' recovery in two different circumstances; it never made the proper comparison of the Plan's treatment of two *different* classes of creditors with *pari* rights against the estate.

Moreover, the Bankruptcy Court found that the Other Parent Claims will receive 33.6% of their claims, *all* of which comes from the estate. However, although the Senior Noteholders

also recover 33.6%, *only* 21.9% comes from the estate.  The rest comes from a spin up from the third-party Subordination Agreements.[5]  [A288-291]  Thus, as set forth in the chart in the Opening Brief, the Plan discriminates against the Senior Noteholders because their distribution from the estate is 53.1% less than the distribution to other general unsecured claims.  (Trustee Br. at 26).  This is not what the Senior Noteholders' bargained for, nor what the law allows.  The Plan must provide the Senior Noteholders with equal treatment from the estate (or at least not materially different) with the Other Parent Claims *prior* to enforcement of the Subordination Agreements.  Then, the Plan must account for the *additional contractual* benefit of subordination.  Based upon the Bankruptcy Court's assumption that the Other Parent Claims do not benefit from subordination, there is no circumstance in which the Other Parent Claims can somehow properly recover equally with the Senior Noteholders which do have subordination rights.  Otherwise, as here, the Plan diverts subordination benefits from the Senior Noteholders.

Even if this Court determines that the Bankruptcy Court's misapplication of the *Armstrong* test was proper, the Bankruptcy Court still erred by not comparing the full amount that the Senior Noteholders are entitled to recover if the Other Parent Claims recover 33.6% of their claim.  Appellees admit that "the House Report concludes that senior debt's receipt of $25 is unfair discrimination because 'the senior debt is entitled to [receive $30]' on the basis of its contractual subordination rights."  (Apl. Br. at 74).  In this legislative history example, the senior debt is entitled to receive $30 because, as equal classes, the trade debt, the senior debt and the subordinated debt each receive $15 and then, the subordinated debt transfers its recovery to the senior debt.  (Trustee Br. at 24).  The initial recoveries of all classes are equal; subordination is applied after.  This is how subordination works.  Here, if the Other Parent Claims, which the

---

[5]  The 21.9% figure represents the portion of the Senior Noteholders' recovery derived from the estate, as stipulated to by the parties.  [A258]

court assumed do not benefit from subordination, are to receive 33.6% of their claims, then the

Senior Noteholders (and all classes of general unsecured creditors) must also receive 33.6% of

their claims *before* taking into account subordination.  Thus, ultimately, if Other Parent Claims

receive 33.6% under the Plan, then Senior Noteholders are actually entitled to receive 59.7% if

subordination is completely enforced (an amount 77.68% greater) and not 35.9% as the

Bankruptcy Court assumed.[6]  The Bankruptcy Court's erroneous assumption diminished the full

amount of recovery to which the Senior Noteholders are legally and contractually entitled.  Even

under the Bankruptcy Court's misapplication of *Armstrong* test, using the proper amounts as

specified above, the discrimination is material.

Accordingly, for the foregoing reasons and as detailed in the Opening Brief, the

Bankruptcy Court committed legal error by misapplying the unfair discrimination test.

## II.    The Bankruptcy Court Erred In Finding The Swap Claim Is Entitled To Senior Treatment Under The PHONES Indenture And EGI Subordination Agreement.

### A.    DCL Plan Proponents Have Not Met Their Burden.

Appellees, relying upon *In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 72 (Bankr.

S.D.N.Y. 2007), *rev'd on other grounds*, 380 B.R. 307 (S.D.N.Y. 2008), argue that they do not

have the burden to show they benefit under the Subordination Agreements because purportedly

there are "no facts in dispute." (Apl. Br. at 102).  Yet, Appellees spend a great deal of time

disputing the facts in an attempt to mischaracterize the Swap Claim as a loan which – by all

counts – it is not.  (*Id.* at 102-111).  As Appellees are "seeking to benefit from the subordination

provisions," they cannot escape their burden of proof as *In re Enron* clearly requires and their

failure to do so warrants reversal.  370 B.R. at 72.

---

[6]  The Senior Noteholders receive 35.9% of their claim only if this initial distribution from the estate (and thus the full amount of recovery of Other Parent Claims) is 21.9%.

9

**B.     The Court Must Reject Appellees' New Contentions And Extrinsic Evidence.**

In arguing the Swap Claim is senior debt under the PHONES Indenture, Appellees

overlook unambiguous language, ignore on-point case law, contradict prior admissions and rely

upon inadmissible parol evidence. (Apl. Br. at 102, 105-108).  Oaktree Capital Management,

L.P. ("Oaktree"), as a plan proponent aligned in interest with all Appellees, argued in its papers

and in open court: "[t]he Swap Claim is not for money loaned. . . .  So the liability on the swap

claim doesn't arise from a loan."[7]  [SA9]  Appellees' contrary assertions here must be rejected.

*Taylor v. Mooney Aircraft Corp.*, 265 Fed. Appx. 87, 93 n.6 (3d Cir. 2008) (When a party made

factual statements in prior court filings, "he is barred from taking any position inconsistent with

those statements under the doctrine of judicial admission.")[8]  (Apl. Br. at 108).  Further, to the

extent that Appellees rely on extrinsic evidence, such as the Credit Agreement, Guarantee

Agreement and SEC filings, to interpret – as Appellees concede – unambiguous provisions of the

PHONES Indenture, the Court must exclude it.  *Pellaton v. Bank of New York*, 592 A.2d 473,

478 (Del. 1991); *Falco v. Alpha Affiliates, Inc.*, 2000 WL 727116, at *8-9 (D. Del. Feb. 9, 2000).

**C.     The Swap Claim Is Not "Indebtedness" Under The PHONES Indenture.**

Even assuming this Court considers the extrinsic evidence and Appellees' contradictory

assertions, the Swap Claim does not qualify as "Indebtedness" under § 14.01(1) of the PHONES

Indenture.  "Indebtedness" means, in part, "(i) . . . obligations represented by notes, bonds,

---

[7]  [SA2] (Oaktree stating that the "Swap Claim is not substantially similar to the Senior Loan claims. 'A fundamental characteristic of an interest rate swap is that the counter-parties never actually loan or advance the notional amount.  The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional amount.'"); [SA9, SA19].

[8]  When Oaktree made its judicial admissions that the Swap Claim was *not* a loan during the first confirmation hearing, it was a DCL Plan Proponent and aligned in interest with that group at that time.  Thus, its admissions are attributable to all of the DCL Plan Proponents who are Appellees here. *Ben-Tom Supply Co. v. V. N. Green & Co.*, 338 F. Supp. 59, 64 (S.D.W. Va. 1971).

debentures or similar evidences of indebtedness" and "(ii) . . . indebtedness for borrowed money."  [A70 (§ 14.01(1) (i), (ii))]  Appellees claim the Swap Claim constitutes "Indebtedness" because (1) the Swap Claim was reported as "Debt" in SEC filings; (2) the Swap Agreements were defined as "Debt for Borrowed Money" under the Credit Agreement and (3) the Swap Claim is similar to "notes, bonds and debentures." (Apl. Br. at 107-08).

First, the fact that Tribune's financial statements in its SEC filings treat the Swap Claim as debt, does not transform the Swap Claim into "Indebtedness," as defined in the PHONES Indenture.  The accounting treatment of debt is distinguishable from the borrowing narrowly defined by "Indebtedness" and cannot be read as interchangeable.  Moreover, as the court-appointed Examiner explained, the Credit Agreement's reference to the Swap Claim as "Debt" merely reflects that the swaps were assumed subject to related guarantees. [DCL-A1571 n.9]

Second, contrary to Appellees' contentions, the Credit Agreement's definition of "Debt for Borrowed Money" has no bearing on what the parties intended those words to mean when they drafted the PHONES Indenture eight years earlier. *In re Payless Cashways*, 215 B.R. 409, 415-16 (Bankr. W.D. Mo. 1997); *Jameson Realty Grp. v. Kostner*, 813 N.E.2d 1124, 1136 (Ill. App. Ct. 2004).  Instead of using extrinsic evidence, the plain meaning of those words govern, which clearly refer to "to receiv[ing] money with the understanding or agreement that it must be repaid, usually with interest."[9]  The Swap Claim, however, is not debt for borrowed money because "[s]wap agreements do not involve the payment of principal; the notional amount never changes hands." *Procter & Gamble Co. v. Bankers Trust Co.*, 925 F. Supp. 1270, 1280 (S.D. Ohio 1996); *Thrifty Oil v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1048 (9th Cir.

---

[9]  Black's Law Dictionary (9th ed. 2009); *In re Enron*, 370 B.R. at 82 (finding "the terms ['indebtedness' and 'money borrowed'] are not ambiguous and must be applied in their ordinary sense"); *In re Leasing Consultants, Inc.*, 2 B.R. 165, 169 (Bankr. E.D.N.Y. 1980).

2002); *JPMorgan Chase & Co. v. Comm'r*, 458 F.3d 564, 566 (7th Cir. 2006).  Further, the payments made between Tribune and Barclays under the Swap Agreement do not constitute "interest payments," as Appellees contend, because "there is no underlying debt."  Christopher Dean Olander & Cynthia L. Spell, *Interest Rate Swaps: Status Under Federal Tax & Securities Laws*, 45 Md. L. Rev. 21, 43 (1986) ("Olander"); *Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 413 Md. 201, 211 (Md. 2010); (Apl. Br. at 108).  Rather, the Swap Agreements, as Oaktree previously admitted, were "merely a promise to pay a stream of income based upon the interest owed on the other's debt.  The underlying debt serve[d] only to calculate the amount of the swap payment."  Olander, 45 Md. L. Rev. at 43; [SA2, SA9].  Here, the Swap Agreement provided that Tribune received payments from Barclays calculated at a variable rate based upon Tribune's underlying loan and Barclays received payments from Tribune calculated at a fixed rate based upon Barclays' underlying loan. [DCL-A1963, DCL-A1967, DCL-A1971]

Lastly, the Swap Claim is not a "note, bond, debenture or similar evidence of indebtedness" – as Appellees suggest – because the Swap Agreements provided for interest on the unpaid balance and set-off rights and were guaranteed by Tribune's subsidiaries.  As the court in *Procter & Gamble* expressly held, interest rate swaps are neither "notes" nor "evidence of indebtedness" because they do not involve the exchange of principal.  925 F. Supp. at 1280.

### D.   The Swap Claim Does Not Qualify As "Senior Indebtedness" Under The PHONES Indenture.

Mischaracterizing the Swap and Credit Agreements, Appellees argue that the Swap Claim is "Senior Indebtedness" under the PHONES Indenture, defined, in part, as "other amounts due in connection with any Indebtedness of the Company."  (Apl. Br. at 105).  Appellees claim that Tribune's obligations under the Swap Agreements are amounts due in "connection with" the Credit Agreement because (1) the Credit Agreement required Tribune to

enter into the Swap Agreements and (2) Tribune, by entering into the Swap Agreements, "effectively substitut[ed]" part of its obligations under the Credit Agreement with those "embodied in the Swap Claim." *Id.*

However, the fact that the Credit Agreement required Tribune to enter into the Swap Agreement to hedge against interest rate fluctuations on part of its loan does not mean the obligations arising under the Swap Agreements – involving different parties and entered into almost a month later – were due "in connection with" the Credit Agreement.[10]  Indeed, as the court in *Crofton*, 413 Md. at 221, recognized, interest rate swaps (*i.e.* the Swap Agreements) are separate obligations from the underlying indebtedness (*i.e.* the Credit Agreement) even where the parties intended to integrate the swap and loan agreements.  Here, the parties never intended the Swap and Credit Agreements to be integrated, as the Swap Agreements have an integration clause, reflecting that they were stand-alone agreements.  Moreover, the termination payment was freely transferable separate from the Credit Agreement and Barclays *did* trade it to Oaktree without it being "stapled" to Credit Agreement debt.  Thus, the Swap Agreements cannot be "alter[ed], var[ied] or contradict[ed]" – let alone subsumed – by the Credit Agreement.  *Jarecki v. Shung Moo Louie*, 722 N.Y.S.2d 784, 786 (2001).

Moreover, by entering into the Swap Agreements, Tribune did not substitute its obligations under the Credit Agreement with those under the Swap Agreements because the obligations were separate, as Appellees admitted below.  Tribune's payments to Barclays in no way satisfied its separate obligations to make principal and interest payments to the Senior

---

[10]  *First Nat'l Bank Ass'n v. Canadian Imperial Bank of Commerce*, 1995 U.S. Dist. LEXIS 12105, at *3 (D. Minn. June 9, 1995) ("Under the Loan Agreement, the Borrowers were also required to enter into certain interest rate swap agreements ("Swap Agreements") . . . The obligations of the Borrowers under the Swap Agreements were separate and distinct from the Loan Agreement."); *Crofton*, 413 Md. at 221-222.

Lenders under the Credit Agreement. [A245, n.65; SA2]; *BKB Props., LLC v. Suntrust Bank*, 453 Fed. Appx. 582, 586-587 (6th Cir. 2011) ("Even construing the Loan . . . and Swap Agreement[s] as . . . a single transaction, . . . BKB had distinct obligations under the loan [and] . . . swap portion of the agreement[s] – that is, BKB had an obligation to repay the Note and a separate obligation to make payments under the Swap'"); Olander, 45 Md. L. Rev. at 41 ("A swap is structured so that each party remains liable on the original loan obligations that form the basis of the swap transaction."); Note, *Tax Treatment of Notional Principal Contracts*, 103 Harv. L. Rev. 1951, 1953 (1990). This makes sense as the two agreements served separate functions. Further, the parties never amended the Credit Agreement or entered into assignments whereby Barclays became a Senior Lender entitled to receive payments for the loan.

Appellees further claim that because the Guarantee Agreement defined "Guaranteed Obligations" to include obligations under the Swap and Credit Agreements, then all the obligations are "one and the same." (Apl. Br. at 106); [DCL-A1912 (§ 1)]. However, the definition in the separate Guarantee Agreement has no bearing on the treatment of the Swap Claim under the PHONES Indenture. Appellees also claim that reading the phrase "due in connection with any Indebtedness" as referring to ancillary amounts owed by the debtor to the primary creditor results in a "pinched" interpretation. (Apl. Br. at 106-07). But Appellees ignore the doctrine of *ejusdem generis*, which requires catch-all terms, like "[i]n connection with any Indebtedness," to be limited to conform to the more specific, preceding items in the sentence. This Court must reject Appellees' sweeping interpretation of the phrase "in connection with" because it contradicts the parties' expectations. *Suburban Auto Rebuilders, Inc. v. Assoc.*

*Tile Dealers Warehouse, Inc.*, 902 N.E.2d 1178, 1190 (Ill. App. Ct. 2009).[11]

### E.   The Swap Claim Does Not Constitute A Senior Obligation Under The EGI Subordination Agreement.

The Swap Claim also does not constitute a "Senior Obligation" because the EGI

Subordination Agreement specifically carves it out as an accrued expense incurred in the

ordinary course of business.  [A78 (¶ 1)]  Without showing any ambiguity in the agreement,

Appellees rely solely upon inadmissible extrinsic evidence in arguing the Swap Claim is not an

"accrued expense" because the financial statements categorized it as short-term and long-term

debt on the balance sheet. (Apl. Br. 110).  Yet, Tribune still had to expense the periodic

payments.  And that extrinsic evidence has no bearing on how "accrued expense" is used in the

EGI Subordination Agreement.  (*Id.* at 110).  The Swap Claim is an "accrued expense" because

Barclays had a claim for approximately $151 million due to the early termination of an interest

rate hedge and that expense was not paid.[12]  Appellees also gloss over the fact that Tribune

entered in the Swap Agreements "in the ordinary course of business" because it was required to

do so under the Credit Agreement [SA16 (§5.02 (c)(x))] and Tribune made numerous payments

due under the Swap Agreement as they became due prior to the commencement of its bankruptcy

case.  Thus, the Swap Claim is not a Senior Obligation.

---

[11]  *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs., LLC*, 30 A.D.3d 1, 8 (N.Y. App. Div. 2006).  Appellees' attempt to limit the breadth of the phrase "in connection with" to include the Swap Claim but exclude those obligations (including insurance premiums and taxes) that "Tribune already had independent obligations to pay" has no support in the PHONES Indenture and is merely an attempt to avoid the absurdity that results from their interpretation.  (Apl. Br. at 107).

[12]  [DCL-A1942 (§ 6(e)); DCL-A1996]; Apl. Br. 104; *Greystone Cmty. Reinvestment Ass'n v. Berean Capital, Inc.*, 638 F. Supp. 2d 278, 283 n.4 (D. Conn. 2009); *FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 537 (6th Cir. 2000); Investopedia (Accrued expense is "[a]n accounting expense recognized in the books before it is paid for."), *available at* http://www.investopedia.com/terms/a/accruedexpense.asp (last visited Oct. 7, 2012).

## CONCLUSION

WHEREFORE, for the reasons stated above, Appellants respectfully request that the

Court (A) vacate the Confirmation Order; (B) reverse the Allocation Disputes Order and

Allocation Disputes Memorandum to the extent that they held that (i) the Plan need not fully

enforce the Subordination Agreements and (ii) the Swap Claim constitutes "Senior

Indebtedness" under the PHONES Indenture and a "Senior Obligation" under the EGI

Subordination Agreement; and (C) grant such other relief as this Court deems just and equitable.

Dated: October 11, 2012
     Wilmington, Delaware

                    Respectfully submitted,

| KASOWITZ, BENSON, TORRES & FRIEDMAN LLP | BIFFERATO GENTILOTTI LLC |
|---|---|
| | _/s/ Garvan F. McDaniel_ |
| David S. Rosner | Garvan F. McDaniel (I.D. No. 4167) |
| Sheron Korpus | 800 N. King Street, Plaza Level |
| Christine A. Montenegro | Wilmington, Delaware 19801 |
| Matthew B. Stein | 302-429-1900 |
| 1633 Broadway | |
| New York, New York 10019 | |
| 212-506-1700 | |

_Counsel for Law Debenture Trust Company of New York, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes_

| McCARTER & ENGLISH, LLP | McCARTER & ENGLISH, LLP |
|---|---|
| | _/s/ Katharine L. Mayer_ |
| David J. Adler | Katharine L. Mayer (I.D. No. 3758) |
| 245 Park Avenue | Renaissance Centre |
| New York, New York 10167 | 405 N. King Street |
| 212-609-6800 | Wilmington, Delaware 19801 |
| | 302-984-6300 |

_Counsel for Deutsche Bank Trust Company Americas, solely in its capacity as successor Indenture Trustee for certain series of Senior Notes_