# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>TRIBUNE COMPANY, *et al.*,<br><br>                          Debtors. | Chapter 11<br>Bankr. Case No. 08-13141 (KJC)<br>Jointly Administered |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK, DEUTSCHE BANK TRUST COMPANY AMERICAS,<br>                          Appellants,<br><br>-against-<br><br>TRIBUNE COMPANY, *et al*,<br><br>                          Appellees. | Bankruptcy Appeal<br><br>Dist. Ct. Case No. 12-1073 (GMS) |

## SUPPLEMENTAL APPENDIX OF THE APPELLANTS, LAW DEBENTURE TRUST COMPANY OF NEW YORK AND DEUTSCHE BANK TRUST COMPANY AMERICAS

KATHARINE L. MAYER
MCCARTER & ENGLISH, LLP
Renaissance Center
405 N. King Street
Wilmington, Delaware 19801
(302) 984-6300

DAVID J. ADLER
MCCARTER & ENGLISH, LLP
245 Park Avenue
New York, New York 10167
(212) 609-6800

*Attorneys for Appellant Deutsche Bank Trust Company Americas*

GARVAN F. MCDANIEL
BIFFERATO GENTILOTTI LLC
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
(302) 429-1900

DAVID S. ROSNER
SHERON KORPUS
CHRISTINE A. MONTENEGRO
MATTHEW B. STEIN
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Appellant Law Debenture Trust Company of New York*

October 11, 2012

# TABLE OF CONTENTS

PAGE

Post-Trial Brief In Support Of Confirmation Of Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By The Debtors, The Official Committee Of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., And JPMorgan Chase Bank, N.A. (*As Modified April 26, 2011*) (Excerpt pages 95-96 [D.I. No. 8897])............................................................................................…...…..SA000001

Exhibit J To The Opening Brief Of Wilmington Trust Company As Successor Indenture Trustee For The PHONES Notes On The Allocation Disputes, dated February 24, 2012 [D.I. No. 10999] (4/14/2011 Hearing Trans., 3755:2-9 [D.I. 11011])............................……..…….…SA000004

Credit Agreement (dated May 17, 2007) (Excerpt § 5.02 (c)(x))............….…………SA000012

Oaktree Capital Management, L.P.'s Opening Brief Regarding Allocation Disputes (Excerpt page 15 [D.I. 11003])…….………………..…………………………………………..SA000018

SA000001

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | Case No. 08-13141 (KJC) |
| Debtors. | Jointly Administered |

**POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF
SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND
ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P.,
AND JPMORGAN CHASE BANK, N.A. (AS MODIFIED APRIL 26, 2011)**

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telecopier: (302) 652-3117

*Counsel for Debtors and Debtors in Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*

DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253

*Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel for Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701-5800

RICHARDS LAYTON & FINGER
Mark Collins (No. 2981)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel for JPMorgan Chase Bank, N.A.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

SA000002

**D.    The DCL Plan Properly Classifies The Swap Claim.**

Next, the Noteholders argue that the DCL Plan improperly classifies the Swap Claim as an Other Parent Claim rather than as a Senior Loan Claim against Tribune.[358]  The undisputed facts,[359] however, demonstrate that several substantial differences between the Swap Claim and the Senior Loan Claims mandate classification of the Swap Claim separately from the Senior Loan Claims and together with the Other Parent Claims.

*First*, the Swap Claim is governed by a different agreement than the Senior Loan Claims, executed among different parties and almost a month after the Senior Credit Agreement.[360] *Second*, the Swap Claim is not substantially similar to the Senior Loan Claims.  "A fundamental characteristic of an interest rate swap is that the counter-parties never actually loan or advance the notional amount.  The swap involves an exchange of periodic payments calculated by reference to interest rates and a hypothetical notional amount."  Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc., 322 F.3d 1039, 1048 (9th Cir. 2003).  The amount of the Swap Claim depended upon interest rate fluctuations and not any money loaned or financing provided to the Debtors.  The Senior Loan Claims, on the other hand, are for money loaned.

*Third*, unlike the Senior Loan Claims, no plausible claim for avoidance of the Swap Claim has been or could be made.  By definition, the interest rate swap giving rise to the Swap Claim provided reasonably equivalent value to Tribune at the time it was executed – the value derived from enabling Tribune to convert a variable rate loan into one with a fixed interest rate.  See 11 U.S.C. § 548(d)(2)(D) ("a swap participant . . . that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer").  Moreover, both

---

[358] Noteholder Obj. ¶¶ 391-392.

[359] Tr. 4/14 at 109:23-25 ("the underlying facts regarding the $150 million swap claim now owned by Oaktree are not really in dispute").

[360] Examiner Report, Vol. 1 at 182 n.727.

sections 546(g) and 560 of the Bankruptcy Code exempt claims like the Swap Claim from

avoidance. See 11 U.S.C. § 546(g) ("the trustee may not avoid a transfer made by or to (or for

the benefit of) a swap participant or financial participant, under or in connection with any swap

agreement"), § 560 (swap termination actions and payments "shall not be stayed, avoided, or

otherwise limited by operation of any provision of this title or by order of a court or

administrative agency in any proceeding under this title").[361]   Most tellingly, no stakeholder has

ever taken action to seek avoidance of the Swap Claim, and the statute of limitations under

section 546 of the Bankruptcy Code has now expired in respect of any such action.  As a

consequence, no credible argument can be made that the Swap Claim has a different risk profile

than any other general unsecured claim against Tribune, and the Swap Claim can and should be

classified together with and treated the same as the general unsecured claims classified into the

class of Other Parent Claims.

   *Fourth*, there is no evidence that the classification of the Swap Claim is the product of

"gerrymandering."  To the contrary, the inclusion of the Swap Claim in the class of Other Parent

Claims did not affect the voting of claims in that class.  Even without considering the vote of the

Swap Claim, the Other Parent Claims class overwhelmingly voted in favor of the DCL Plan with

220 out of 231 voting creditors (95.24%), holding 88.02% by dollar amount of the voted claims

within the class, accepting the DCL Plan.

   **E.**   **The DCL Plan's Releases And Bar Order Are Appropriate.**

   Finally, in addition to their general criticism of the DCL Plan settlement, the Noteholders

argue that certain of the releases and the Bar Order to be provided as part of that settlement are

impermissible.  This argument is a thinly-disguised attack on the settlement and should be

---

[361] Based on section 560, the Examiner concluded that the Swap Claim was not subject to avoidance, and all of his recovery scenarios provide for allowance of the Swap Claim in full.  Examiner Report, Vol. 2 at B-6.

SA000004

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | Case No. 08-13141 (KJC) |
| TRIBUNE COMPANY, et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**BINDER OF EXHIBITS REFERENCED
IN OPENING BRIEF OF WILMINGTON
TRUST COMPANY, AS SUCCESSOR
INDENTURE TRUSTEE FOR THE PHONES
NOTES ON THE ALLOCATION DISPUTES**

**SULLIVAN HAZELTINE ALLINSON LLC**
William D. Sullivan (I.D. No. 2820)
Elihu E. Allinson, III (I.D. No. 3476)
901 N. Market St., Suite 1300
Wilmington, DE 19801
302-428-8191

-and-

**BROWN RUDNICK LLP**
Robert J. Stark
Martin S. Siegel
Gordon Z. Novod
Seven Times Square
New York, NY 10036
212-209-4800

Counsel for Wilmington Trust Company, solely in
its capacity as successor Indenture Trustee for the
PHONES Notes

SA000005

# Exhibit J

SA000006

```
 1              Proceedings - 4/14/11

 2   swap claim classification.

 3        Your Honor, we don't believe that

 4   this Court should countenance this, what

 5   we believe is a very direct, apparent,

 6   intentional money grab by this

 7   classification scheme, which had the

 8   intended benefit for the DCL Plan

 9   proponents to get an otherwise hostile

10   creditor on board for their new plan of

11   reorganization.

12        Thank you.

13        MR. JOHNSTON:  Good afternoon, your

14   Honor.  Jim Johnston of Dewey & LeBoeuf

15   on behalf of both Oaktree and Angelo

16   Gordon.

17        Back again on the swap claim, and I

18   guess we now have a full picture, which

19   we didn't have yesterday after

20   Mr. Pachulski's argument.  I will try and

21   address both Mr. Golden's argument and

22   the remarks that were made by

23   Mr. Pachulski, to the extent there were

24   some different ones.

25        Taking Mr. Golden's last point
```

SA000007

1           Proceedings - 4/14/11

2     first, as I'm sure you noted when you

3     read the brief of the DCL proponents --

4     actually, the briefs of the DCL

5     proponents, there are a number of

6     footnotes in there where certain of the

7     proponents basically disclaimed arguments

8     made on behalf of other proponents.

9           It is the nature unfortunately of

10    the exercise we went through.  You have

11    plaintiff and defendant joining a brief

12    to support a settlement, and obviously

13    when you're discussing merits or demerits

14    of certain claims or positions, one side

15    or another is going to reserve their

16    rights in case your Honor chooses not

17    confirm the plan.  So no more

18    significance than that should be

19    attributed to those footnotes.

20          Starting with the argument that the

21    swap claim should not be classified with

22    other parent claims against Tribune, your

23    Honor, the bottom line is that the swap

24    claim simply is not substantially similar

25    to the credit agreement claims against

SA000008

1            Proceedings - 4/14/11

2    Tribune, and in a moment I'll get to the

3    reasons why it is in fact substantially

4    similar to the other parent claims

5    against Tribune and is properly

6    classified there.

7         Consider the following.  First, as

8    we heard Mr. Golden describe, the swap

9    claim arises under a completely different

10   agreement than the credit agreement.

11   It's the master agreement and the

12   confirmations.  It is an agreement with

13   different parties than the parties to the

14   credit agreement and it was executed

15   almost a month after the credit

16   agreement.

17        Second, the nature of the liability

18   represented by the swap claim is

19   completely different than the liability

20   represented by the credit agreement

21   claims.  The credit agreement claims are

22   for money loaned in connection with the

23   2007 LBO transactions.

24        In contrast, as we heard

25   Mr. Pachulski state at length yesterday,

SA000009

Page 3755

 1                  Proceedings - 4/14/11

 2    the swap claim is not for money loaned.

 3    It represents Tribune's liability under

 4    an interest rate swap agreement that was

 5    terminated as a consequence of Tribune's

 6    bankruptcy filing.

 7         And here, I would refer the Court

 8    to the Ninth Circuit's decision in the

 9    Thrifty Oil case, at 322 F.3d 1039, and

10    cite 148, where the Circuit observed that

11    "a fundamental characteristic of an

12    interest rate swap is that the

13    counterparties never actually loan or

14    advance the notional amount.  The swap

15    involves an exchange of periodic payments

16    calculated by reference to interest rates

17    in a hypothetical notional amount."

18         So the liability on the swap claim

19    doesn't arise from a loan.  It arises

20    basically from Tribune's hedging of the

21    risk negotiated with the variable

22    interest rate called for in the credit

23    agreement.  And in fact, your Honor,

24    unlike a loan, where there is principal

25    outstanding, you loan principal and then

SA000010

1            Proceedings - 4/14/11

2    you have a claim for the principal, had

3    interest rates moved in other ways in

4    2008, Tribune could have had little to no

5    liability under the swap agreement.  It

6    had to do with interest rate hedging.

7    The nature of the claims is different.

8            Third, the risk profile of the swap

9    claim is vastly different from the risk

10   profile of the credit agreement claims.

11   Simply put, notwithstanding some of the

12   new arguments you have heard in the last

13   few days, there is no colorable claim to

14   be made that the swap claim somehow could

15   or should be avoided as a fraudulent

16   conveyance.  And this is so for a number

17   of reasons.

18           One, unlike with the credit

19   agreement loans, as to which so many

20   arguments have been made, no one can

21   credibly argue that Tribune did not

22   receive reasonably equivalent value in

23   connection with the swap.  By definition,

24   an interest rate swap agreement that

25   gives rise to the swap claim provides

SA000011

Page 3757

1              Proceedings - 4/14/11

2    value.  It enabled Tribune to hedge its

3    risk associated with its variable

4    interest rate loans and to effectively

5    convert at least a portion of that loan

6    into a fixed-rate loan.  It was done

7    pursuant to market standard forms on

8    market standard terms.

9         And you need look no further than

10   the Code itself to confirm this point.

11   Section 548(b)(2)(D) specifically

12   provides that a swap participant that

13   receives a transfer in connection with a

14   swap agreement takes for value to the

15   extent of the transfer.

16        Two, the Bankruptcy Code

17   specifically exempts swap claims from

18   avoidance.  First, you have Section

19   546(g), which provides that the trustee

20   may not avoid a transfer made by or to or

21   for the benefit of a swap participant or

22   financial participant under or in

23   connection with any swap agreement.

24        Now, you heard Mr. Golden say today

25   that Section 546(g) doesn't apply here

SA000012

$8,028,000,000

**CREDIT AGREEMENT**

Dated as of May 17, 2007

Among

**TRIBUNE COMPANY**

as Borrower

**THE INITIAL LENDERS NAMED HEREIN**

as Initial Lenders

**JPMORGAN CHASE BANK, N.A.**

as Administrative Agent

**MERRILL LYNCH CAPITAL CORPORATION**

as Syndication Agent

**CITICORP NORTH AMERICA, INC.,**

**BANK OF AMERICA, N.A.**

and

**BARCLAYS BANK PLC**

as Co-Documentation Agents

and

**J.P. MORGAN SECURITIES INC.,**
**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**
**CITIGROUP GLOBAL MARKETS INC.**
**and**
**BANC OF AMERICA SECURITIES LLC**

as Joint Lead Arrangers and Joint Bookrunners

**Professionals' Eyes Only**
**Highly Confidential -- Attorneys' Eyes Only**

**ADH Exhibit 11**

SA000013

(ii)     Borrower shall (i) apply for a favorable determination letter from the Internal Revenue Service that the ESOP is tax-qualified and tax-exempt under Sections 401(a) and 501(a), respectively, of the Code and that the ESOP is an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code; (ii) use its best efforts to obtain a favorable determination letter from the Internal Revenue Service that the ESOP is tax-qualified and tax-exempt under Sections 401(a) and 501(a), respectively, of the Code and that the ESOP is an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code; (iii) take all actions reasonably necessary to preserve the existence of the ESOP and to maintain its tax-qualified status under Sections 401(a) and 501(a), respectively, of the Code and its status as an employee stock ownership plan; and (iv) administer the ESOP in compliance in all material respects with the terms of the ESOP and the provisions of the Code and ERISA, as applicable to the ESOP, and make any remedial amendments required by the Internal Revenue Service within the time period allowed for the amendments.

(iii)     [Intentionally omitted].

(iv)     Promptly upon the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in material liability to a Loan Party or a Subsidiary, Borrower shall deliver to the Agent a written notice specifying the nature thereof, what action the Loan Party or its Subsidiaries have taken, are taking or propose to take with respect thereto, and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor, PBGC or Multiemployer Plan sponsor with respect thereto.

(v)     Upon request by the Lead Arrangers, deliver to the Agent copies of: (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Loan Party or its Subsidiaries with the Internal Revenue Service with respect to each Plan; (ii) the most recent actuarial valuation report for each Plan; (iii) all written notices received by any Loan Party from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Lead Arrangers shall reasonably request.

SECTION 5.02.     Negative Covenants. So long as any Advance shall remain unpaid, any Letter of Credit is outstanding (or has been cash collateralized or secured by a back-up letter of credit), any Lender shall have any Commitment hereunder or any other Obligation shall remain outstanding (other than contingent obligations for unasserted claims) unless the Required Lenders shall otherwise consent in writing, Borrower will not and will not cause or permit any Subsidiaries to:

(a)     Liens, Etc. Create, permit or suffer to exist any Lien on or with respect to any of its properties, whether now owned or hereafter acquired, other than:

(i)     Permitted Liens;

(ii)     Liens securing Purchase Money Obligations incurred pursuant to Section 5.02(c)(v) upon or in any real property, equipment or any fixed or capital assets acquired or held by Borrower or any Subsidiary in the ordinary course of business to secure the purchase price of such property, equipment or assets or to secure Debt incurred solely for the purpose of financing the acquisition, construction or improvement of such property, equipment or assets, in each case created within 180 days of any such acquisition or the completion of such construction or improvement, or Liens existing on such property, equipment or assets at the time of its acquisition (other than any such Liens created in

-72-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

SA000014

contemplation of such acquisition that were not incurred to finance the acquisition of such property), or Liens securing Capital Lease Obligations incurred pursuant to Section 5.02(c)(v) or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided, however, that no such Lien shall extend to or cover any properties other than the property, equipment or assets being acquired constructed or improved, and no such extension, renewal or replacement shall extend to or cover any properties not theretofore subject to the Lien being extended, renewed or replaced;

(iii)     the Liens existing on the Closing Date, except for (x) Liens exceeding $25,000,000 individually and not described on Schedule 5.02(a) hereto and (y) other Liens in an aggregate amount exceeding $50,000,000 and not described on Schedule 5.02(a) hereto;

(iv)     Liens on (x) property of a Person existing at the time such Person is merged into or consolidated with Borrower or any Subsidiary of Borrower or becomes a Subsidiary of Borrower and (y) any property existing at the time of its acquisition thereof by Borrower or any of its Subsidiaries; provided that such Liens were not created in contemplation of such merger, consolidation or acquisition and do not extend to any assets other than (A) those of the Person so merged into or consolidated with Borrower or such Subsidiary or (B) such assets acquired by Borrower or such Subsidiary or (C) improvements on or proceeds of the assets described in clause (A) or (B);

(v)     Liens granted pursuant to the Pledge Agreement to secure the Secured Obligations;

(vi)     Liens securing the Existing Notes equally and ratably with the Secured Obligations;

(vii)     other Liens securing Debt permitted under Section 5.02(c)(v);

(viii)     the replacement, extension or renewal of any Lien permitted by clause (a)(iii) or (a)(iv) above or this clause (viii) upon or in the same property theretofore subject thereto or the replacement, extension or renewal of the Debt secured thereby, and any improvements on or proceeds of such property and any property covered by an after-acquired property clause in such Lien;

(ix)     Liens junior to the Lien created by the Pledge Agreement covering Collateral securing Borrower High Yield Notes that are senior notes;

(x)     Liens securing Debt permitted to be incurred under Section 5.02(c)(xi)(B), (xviii) and (xx); and

(xi)     other Liens securing obligations in an aggregate amount not to exceed $100,000,000.

(b)     Mergers, Dispositions, Etc.  Merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of the assets of Borrower and its Subsidiaries taken as a whole (whether now owned or hereafter acquired) to, any Person, except that:

-73-

TRB0520850

OCMS0001207

SA000015

(i)      any Subsidiary of Borrower may merge or consolidate with or into, or dispose of assets to any Guarantor, any Subsidiary of Borrower that is a holding company with no stand-alone operations or income may merge or consolidate with or into or dispose of all or substantially all of such Subsidiary's assets to Borrower, any Subsidiary of Borrower may distribute to Borrower any Equity Interests of such Subsidiary's Subsidiaries; provided that no Default exists or would result therefrom;

(ii)      any Subsidiary of Borrower may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it so long as, either (1) such Subsidiary shall be the survivor thereof, or (2) if the other Person shall be the survivor thereof, such other Person surviving such consolidation or merger shall be a U.S. organized entity and, if such other Person is merging with a Guarantor, such Person shall assume all the obligations of such Guarantor under the Loan Documents pursuant to Section 5.01(l); provided that no Event of Default exists or would result therefrom;

(iii)     as part of any Asset Sale otherwise permitted by this Agreement, any Subsidiary of Borrower may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; provided that no Event of Default exists or would result therefrom;

(iv)     any Subsidiary of Borrower may liquidate or dissolve if Borrower determines in good faith that such liquidation or dissolution is in the best interest of Borrower and is not materially disadvantageous to the Lenders; provided that no Event of Default exists or would result therefrom; and

(v)      the Acquisition may be consummated in accordance with the Acquisition Agreement (without giving effect to any waiver, amendment, supplement or other modification thereto that is material and adverse to the Lenders without the Agent's prior approval); provided that (1) the Acquisition is consummated on or before May 31, 2008, (2) prior to or contemporaneously with the consummation of the Acquisition, the Zell Investment Agreement shall have been duly executed and delivered and shall be in full force and effect unless otherwise terminated in accordance with the terms thereof; (3) each of the other Second Step Transactions shall have been consummated prior to or substantially concurrent with the consummation of the Acquisition, (4) Borrower shall be in compliance with the Second Step Covenants on a Pro Forma Basis for the Test Period ending immediately prior to the consummation of the Acquisition and (5) no Default exists or would result therefrom (the conditions set forth in subclauses (1), (2), (3), (4) or (5), collectively, the "Acquisition Conditions").

(c)      Debt.  Incur, create, assume or permit to exist, directly or indirectly, any Debt, except:

(i)      Debt owed to Borrower or to a wholly owned Subsidiary of Borrower permitted by Section 5.02(h)(vi);

(ii)     Debt existing on or anticipated to be incurred on or about the Closing Date and described on Schedule 5.02(c)(ii) hereto or listed in the Side Letter;

(iii)    Debt incurred under this Agreement and the other Loan Documents; provided that the incurrence of Incremental Term Loans is subject to the additional conditions thereto set forth in Section 2.17;

-74-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

TRB0520851

OCMS0001208

SA000016

(iv)     Debt of a Person existing at the time such Person is merged into or con-solidated with Borrower or a Subsidiary of Borrower or becomes a Subsidiary of Bor-rower in connection with a Permitted Acquisition; provided that such Debt is not created in contemplation of such Permitted Acquisition;

(v)     Debt in respect of Purchase Money Obligations, Capital Lease Obliga-tions and other Debt not otherwise permitted hereunder which, together with Debt se-cured by Liens permitted under Section 5.02(a)(vii), does not exceed an aggregate princi-pal amount of $100,000,000 at any time outstanding and any guarantee of Debt in respect thereof;

(vi)     endorsement of negotiable instruments for deposit or collection or simi-lar transactions in the ordinary course of business;

(vii)     (A) Debt of Borrower and its Subsidiaries owing to the seller in any Permitted Acquisition and (B) any Guaranteed Debt in respect thereof so long as such Debt does not, when taken together with all other Debt incurred pursuant to clause (A) and any refinancings thereof, exceed more than $100,000,000 in aggregate principal amount outstanding at any time; provided, however, that any Subsidiary may incur Debt pursuant to this clause (vii) in excess of $100,000,000 for a period of time not to exceed 30 consecutive days if such Debt is created or assigned in anticipation of a sale or any other disposition of a Subsidiary or in anticipation of the dividend or distribution or other spin-off transaction of the Capital Stock of such Subsidiary to Borrower's shareholders permitted pursuant to Section 5.02(b)(iv);

(viii)     to the extent constituting Debt, obligations in respect of net working capital adjustments and/or earn out arrangements pursuant to a Permitted Acquisition;

(ix)     any Debt extending the maturity of, or refunding or refinancing, in whole or in part, any Debt permitted by clauses (c)(ii) or (iv) above or clauses (c)(xv) or (xviii) below (or this clause (ix)); provided that (A) the principal amount of such Debt shall not be increased above the principal amount thereof outstanding immediately prior to such extension, refunding or refinancing, plus the amount of any accrued and unpaid interest and premiums required to be paid thereon and reasonable fees and expenses associated therewith, (B) no portion of such refinancing Debt matures prior to the earlier of the ma-turity date of the Debt being refinanced and the date that is six months after the Tranche B Maturity Date and (C) the direct and contingent obligors with respect to such Debt are not changed (except that any refinancing Debt may provide for guarantees by the Guaran-tors; provided that any such guarantees are on a subordinated basis to such Guarantor's obligations under the Guarantee); provided that refinancings of the Medium Term Notes with proceeds of Delayed Draw Tranche B Advances shall be deemed incurred under clause (iii) above;

(x)     (A) Debt in respect of Hedging Obligations (other than Secured Hedging Obligations) that does not exceed $25,000,000 in an aggregate principal amount out-standing at any time; provided, however, that such limitation shall not apply to Hedging Obligations with respect to the PHONES and (B) Debt in respect of Secured Hedging Obligations with respect to interest rates, foreign currency exchange rates or commodity prices; provided that all Hedge Agreements shall be entered into in the ordinary course of business or as required by this Agreement and not for speculative purposes;

-75-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

SA000017

(xi)     to the extent constituting Debt, (A) obligations under performance bonds, surety bonds and letter of credit obligations to provide security for worker's compensation claims and (B) obligations in respect of bank overdrafts not more than five Business Days overdue, in each case, incurred in the ordinary course of business;

(xii)     to the extent constituting Debt, indemnification obligations and other similar obligations of Borrower and its Subsidiaries in favor of directors, officers, employees, consultants or agents of Borrower or any of its Subsidiaries extended in the ordinary course of business;

(xiii)     Guaranteed Debt with respect to payment obligations of any wholly owned Subsidiary in respect of Debt otherwise permitted under this Section 5.02(c); provided that no Subsidiary shall guarantee the Existing Notes;

(xiv)     Debt owing to insurance companies to finance insurance premiums incurred in the ordinary course of business;

(xv)     after consummation of the Acquisition, Borrower High Yield Notes or Borrower Acquisition Bridge Loans in an aggregate amount not to exceed (x) $4,205.0 million minus (y) the aggregate principal amount of Incremental Term Advances drawn, and any Guaranteed Debt in respect thereof;

(xvi)     letters of credit (other than Letters of Credit) in an aggregate amount not to exceed $75.0 million;

(xvii)     prior to the consummation of the Acquisition, the Zell Note and, after consummation of the Acquisition, the Zell Sub Note (and any pay-in-kind interest thereon);

(xviii)     Debt incurred to finance the purchase of the TMCT Real Property in an aggregate principal amount not to exceed $175.0 million, and any Guaranteed Debt in respect thereof;

(xix)     Junior Capital issued as part of a Special Contribution;

(xx)     Debt arising in connection with a Receivables Facility or the sale or financing of accounts receivable, and any Guaranteed Debt of a Receivables Subsidiary in respect thereof, in an aggregate amount not to exceed $450,000,000, incurred by Borrower or any of its Subsidiaries at any time outstanding;

(xxi)     Debt in an aggregate amount not to exceed $50,000,000 at any one time outstanding arising from agreements with any governmental authority or political subdivision or agency thereof relating to the construction of buildings, and the purchase and installation of equipment, to be used in the business of the Companies;

(xxii)     unsecured Debt of Borrower or a Guarantor not otherwise permitted to be incurred hereunder that does not require any principal amortization prior to maturity and matures no earlier than six months after the Tranche B Maturity Date; provided that (x) to the extent such Debt is incurred by a Guarantor or is guaranteed by a Guarantor, such Debt is subordinated in right of payment to such Guarantor's Guarantee of the Obligations and (y) after giving effect to such transaction on a Pro Forma Basis, Borrower

-76-

Professionals' Eyes Only
Highly Confidential -- Attorneys' Eyes Only

SA000018

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| TRIBUNE COMPANY, *et al.*, | ) Case No. 08-13141 (KJC) |
| | ) Jointly Administered |
| Debtors. | ) **Hearing date:** March 5, 2012, at 10:00 a.m. |
| | ) |
| | ) |
| | ) |

## OAKTREE CAPITAL MANAGEMENT, L.P.'s
## OPENING BRIEF REGARDING ALLOCATION DISPUTES

Robert S. Brady (Bar No. 2847)
M. Blake Cleary (Bar No. 3614)
YOUNG CONAWAY STARGATT &
    TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone (302) 571-6600
Facsimile (302) 571-1253

    - and -

Bruce Bennett
James O. Johnston
Joshua M. Mester
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, CA 90071-1530
Telephone (213) 621-6000

*Attorneys for Oaktree Capital Management, L.P.*

US1 32338859.2

SA000019

recognize that the Swap Claim is a component of borrowed money – namely, the interest that is attributable to the money borrowed under the Credit Agreement.[9]

All of this confirms what the Noteholders (and every other party) assumed from the beginning of these proceedings – that the deeply-subordinated PHONES Notes are subordinated to the $151 million Swap Claim, which was treated as "Debt for Borrowed Money" in Tribune's loan agreements and financial statements and which arose out of and in connection with the Credit Agreement that everyone agrees is senior under the PHONES Indenture.[10]

---

[9]  Consideration of Tribune's loan documents and financial statements is appropriate in this context. The Seventh Circuit has held that, under Illinois law (which applies under Section 1.12 of the PHONES Indenture), there are two types of contractual ambiguities that may give rise to the admission of parol evidence:

> One is internal ("intrinsic"), and is present when the agreement itself is unclear. The other is external ("extrinsic") and is present when, although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen. So parol and other extrinsic evidence is admissible, even in a case involving a contract with an integration clause, to demonstrate that the contract is ambiguous.

*Federal Deposit Ins. Co. v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir. 1989) (internal citations omitted). In this case, even if the language in the PHONES Indenture is clear, "anyone familiar with the real-world context of the agreement" might "wonder what it meant with reference to" the question of whether the Swap Claim falls within the definition of "Indebtedness".

[10]  Although the Court previously approved the classification of the Swap Claim in the class of Other Parent Claims, *see* Opinion On Confirmation [docket no. 10133] (the "Confirmation Opinion") at 102-04, it is anticipated that, as they did in connection with the prior confirmation proceedings, the Noteholders will point to the DCL Plan Proponents' arguments in support of that classification as "evidence" that the Swap Claim is not "Indebtedness" under the PHONES Indenture. Specifically, the Noteholders likely will argue that the DCL Plan Proponents' statements that the Swap Claim does not constitute Credit Agreement debt and is not "for money loaned" somehow prove that the Swap Claim is not senior.

Not so. There is nothing inconsistent with the arguments made in support of classification of the Swap Claim and the points established above. Oaktree is not suggesting that the Swap Claim itself is for money loaned or that it is part of the Senior Loan Claims. The point simply is that the Swap Claim is due "in connection with" the Credit Agreement,

- 15 -